**STEERING COMMITTEE, et al., Plaintiffs–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellant,**

and

**Aeromexico, Defendant–Appellee.**

No. 90–55217.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 5, 1993.

Decided Sept. 20, 1993.

Steven J. Riegel, U.S. Dept. of Justice, Washington, DC, for defendant-appellant.

Juanita M. Madole and Joseph T. Cook, Speiser, Krause, Madole & Cook, Irvine, CA, for plaintiffs-appellees.

George F. Archer, Archer & Associates, Ltd., Chicago, IL, for plaintiff-appellee Plaintiffs' Crew Committee.

Frank A. Silane, Condon & Forsyth, Los Angeles, CA, for defendant-appellee.

Before: CANBY, BOOCHEVER, and NORRIS, Circuit Judges.

BOOCHEVER, Circuit Judge:

The United States appeals the district court's apportionment of liability among the parties involved in a 1986 midair collision between an Aeromexico jetliner and a single-engine Piper aircraft over Cerritos, California. The government argues that the district court erred by failing to apply Cal.Evid.Code § 669(a) and by improperly articulating the standard of vigilance for pilots under 14 C.F.R. § 91.67(a). The government also

claims that the district court clearly erred in finding the Aeromexico pilots vigilant in their professional duties. We hold that the district court properly applied Cal.Evid.Code § 669(a) and correctly articulated the standard of care for pilots to see and avoid other aircraft. We also hold that the district court did not clearly err in finding that the Aeromexico pilots committed no negligent act that proximately caused this disaster. We therefore affirm.

## BACKGROUND

On August 31, 1986, an Aeromexico DC–9 jet, operating as Aeromexico Flight 498, collided with a single-engine Piper aircraft operated by William F. Kramer. The midair collision occurred at approximately 11:52 a.m. Pacific Daylight Time while the Aeromexico jet was receiving air traffic control services from a Federal Aviation Administration (FAA) facility on its approach to Los Angeles International Airport. Both aircraft were disabled in the collision and crashed in the Los Angeles County community of Cerritos, California. All 64 persons aboard the Aeromexico jet, the three persons aboard the Piper aircraft, and 15 persons on the ground were killed. The crash also injured several other ground victims and caused property damage in the neighborhood of the crash site.

Actions for wrongful death, personal injury, and property damage were brought against the Estate of William F. Kramer, Aeromexico, and the United States. The Judicial Panel on Multidistrict Litigation ordered all lawsuits transferred to the United States District Court for the Central District of California for consolidated proceedings. See 28 U.S.C. § 1407 (1988). The district court issued an order bifurcating the liability and damages issues and ordered a trial to determine the liability, if any, of the Estate of William F. Kramer, Aeromexico, and the United States.

The district court had jurisdiction over the Estate of William F. Kramer pursuant to 28 U.S.C. § 1441(c) (1988), over Aeromexico pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330, 1603 (1988), and over the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1988).

Aeromexico did not dispute its liability to those suing on behalf of the passengers for damages not to exceed $75,000 per passenger under the Warsaw Convention, Oct. 12, 1929, 49 Stat. 3000, 137 L.N.T.S. 11, reprinted in 49 U.S.C. § 1502 note (1976), as supplemented by the Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, Agreement CAB 18900, approved by CAB Order E–23680, 31 Fed. Reg. 7302 (1966), reprinted in 49 U.S.C. § 1502 note (1976). A jury was impaneled, however, to decide the liability of the Estate of William F. Kramer to those suing on behalf of the passengers and ground victims, to render an advisory verdict regarding the liability of the United States to those suing on behalf of the passengers and ground victims, and to render an advisory verdict regarding the liability of Aeromexico to those suing on behalf of the ground victims. The jury found that the Estate of William F. Kramer was fifty percent liable for the accident. It advised that the United States should be found fifty percent liable. The jury also advised that the Aeromexico pilots had complied with 14 C.F.R. § 91.67(a) (1986) (requiring pilots to be vigilant in seeing and avoiding other aircraft) and that Aeromexico was not negligent.

On August 11, 1989, the district court ordered that liability be apportioned equally between the Estate of William F. Kramer and the United States. Additionally, the court held that "the crew of Aeromexico Flight 498 [ ] was not negligent, did not proximately cause or contribute to the cause of the midair collision which was the subject matter of this trial, and is free from tort liability as to all plaintiffs."

The district court granted the United States' request to certify an interlocutory appeal on October 13, 1989. The Ninth Circuit granted the United States' petition for interlocutory appeal on February 20, 1990.

## DISCUSSION

I. *Appellate jurisdiction.*

According to 28 U.S.C. § 1292(b) (1988),

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a *controlling question of law* as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order ... (emphasis added).

This court granted interlocutory review for "all liability issues" determined by the district court's August 11, 1989, order.

▉▉▉ Whether the district court failed to articulate the appropriate standard of conduct for pilots under the federal aviation regulations is a question of law appropriate for interlocutory appeal. *See Vollendorff v. United States,* 951 F.2d 215, 217 (9th Cir. 1991) (existence and extent of standard of conduct are questions of law). Whether the district court erred in applying the regulatory standard to the facts of this case and concluding that no negligence existed, however, is a mixed question of law and fact. *Barnett v. Sea Land Serv., Inc.,* 875 F.2d 741, 745 (9th Cir.1989). Some courts have refused to permit interlocutory appeals of mixed questions of law and fact pursuant to 28 U.S.C. § 1292(b). *See, e.g., Link v. Mercedes–Benz of N. Am., Inc.,* 550 F.2d 860, 863–64 (3d Cir.) (en banc), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Securities & Exch. Comm'n v. First Jersey Sec., Inc.,* 587 F.Supp. 535, 536 (S.D.N.Y.1984); *Weisman v. Darneille,* 78 F.R.D. 671, 674 (S.D.N.Y.1978) (appellate court does not have jurisdiction to hear mixed questions of law and fact). Before addressing the issue of whether Aeromexico breached the regulatory standard of care, therefore, we must determine whether we have jurisdiction over the issue even though

the matter is not purely one of law. We resolve this jurisdictional question *sua sponte* since none of the parties raised it. *McGuckin v. Smith,* 974 F.2d 1050, 1052 (9th Cir. 1992)·(appellate court required to raise issues of jurisdiction *sua sponte*).

The district court's order certifying this interlocutory appeal cited *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 479 F.Supp. 1118 (E.D.N.Y.1978) [hereinafter *Air Crash Disaster*], in support of its finding that the liability issues in this case presented controlling questions of law under § 1292(b). *Air Crash Disaster* catalogues a series of cases in which both legal and factual findings were reviewed on interlocutory appeal. In multiparty negligence cases, particularly cases involving multidistrict litigation, the court found that interlocutory review of liability determinations served the congressional purposes underlying § 1292(b):

> [T]he acceptance of section 1292(b) certification by the respective circuits and their subsequent extensive examinations of the factual and legal issues contained therein indicate that the circuit courts were of the opinion that, in these cases, the determination of the liability issue itself constituted a controlling question of law. Indeed, such a finding would not be violative of the expressed federal disfavor towards premature piecemeal appeals, as the issue of liability in such unusual cases is more closely analogous to the intermission which marks the conclusion of Act I of a two-act play than it is to numerous and sundry pretrial motions which may be regarded as mere scenes in Act I.

*Id.* at 1126 (citations omitted). We agree with the court in *Air Crash Disaster* that the liability phase of a multidistrict, multiparty case of the sort at hand is appealable under § 1292(b).[1]

▉▉▉ Moreover, as noted above, a pure legal question is identifiable in this case. We

---

1. Additionally, resolution of the liability issue in these cases coincides with the purpose of § 1292(a), regarding interlocutory appeals for injunctions, receivers, and admiralty cases. That section "was primarily enacted to avoid the delay and expense engendered by taking further evi-

dence on the question of damages, when such an undertaking might be unnecessary if the decree as to liability should be reversed." *Air Crash Disaster,* 479 F.Supp. at 1126 (quoting *Slatton v. Martin K. Eby Constr. Co.,* 491 F.2d 707, 708 (8th Cir.1974)).

have held that the presence of a pure legal question permits the court to resolve all questions material to the order:

> Although section 1292(b) requires certification by the trial court of "controlling" questions of law, the appeals it authorizes are from orders not questions. Thus, our review of the present controversy is not automatically limited solely to the question deemed controlling by the district court. We recognize that the scope of appellate review under section 1292(b) is not so broad as to allow reexamination of all matters previously ruled upon in the case. Nonetheless, we may address those issues *material* to the order from which appeal has been taken.

*In re Cinematronics, Inc.*, 916 F.2d 1444, 1448–49 (9th Cir.1990) (citations omitted). *See also Nuclear Engineering Co. v. Scott*, 660 F.2d 241, 246 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). In light of *Air Crash Disaster*, we hold that both the standard of care issue and the application of that standard to the facts of this case are material to the district court's order. We therefore exercise jurisdiction over all of the liability issues in this case.

## II. *Effect of a Federal Regulatory Violation under Cal.Evid.Code § 669(a).*

■■■ The parties do not dispute that the controlling substantive law for suits against Aeromexico under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–11 (1988), is California law. *See Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 783 (9th Cir.1991). According to Cal.Evid.Code § 669(a), a presumption of negligence exists if (1) a statute, ordinance, or regulation is violated; (2) the violation proximately caused death or injury to a person or property; (3) the statute, ordinance, or regulation was designed to prevent the death or injury complained of; and (4) the statute, ordinance, or regulation was intended to protect the class of person or property injured. The presumption may be rebutted where "[t]he person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." Cal.Evid.Code § 669(b)(1) (West Supp.1993).

■■■ The regulation underlying the allegation of negligence in this case is 14 C.F.R. § 91.67(a) (1986), which provides in relevant part:

> When weather conditions permit, regardless of whether an operation is conducted under Instrument Flight Rules or Visual Flight Rules, *vigilance shall be maintained* by each person operating an aircraft *so as to see and avoid other aircraft* in compliance with this section (emphasis added).[2]

The parties agree that a violation of this regulation triggers a presumption of negligence under Cal.Evid.Code § 669. *See Rudelson v. United States*, 602 F.2d 1326, 1330 (9th Cir.1979) (violation of 14 C.F.R. § 91.-67(a) raises a presumption of negligence under California law). The government asserts that the district court erred by failing to apply the § 669 presumption to this case. Such a failure would be erroneous, however, only if § 669 were triggered by a violation of the regulation. Therefore, the issue is whether Aeromexico violated § 91.67(a), thereby raising a presumption of negligence under § 669.

## III. *Standard of Care for Pilots under 14 C.F.R. § 91.67(a).*

■■■ We must first decide whether the district court examined the conduct of Aeromexico's pilots using the appropriate standard of care under § 91.67(a). "The existence and extent of the standard of conduct [in a negligence action] are questions of law, reviewable *de novo....*" *Vollendorff*, 951 F.2d at 217.

As noted above, § 91.67(a) requires pilots to exercise vigilance so as to see and avoid other aircraft. The real question is what constitutes "vigilance." The parties advance three different possibilities:

1. "Vigilance" requires a pilot to see and avoid other aircraft unless to do so would be *physically impossible;*

---

**2.** The current version of this regulation is 14    C.F.R. § 91.113(b) (1992).

2. "Vigilance" requires a pilot to see and avoid other aircraft unless to do so would be *more than unreasonable;* and

3. "Vigilance" requires a pilot to see and avoid other aircraft unless to do so would be *unreasonable.*

The distinction between the second and third definitions is difficult to conceptualize and even more difficult to articulate. Nevertheless, whether there is an "elevated" standard of care somewhere between reasonableness and physical impossibility is a concept debated in this case.[3] The United States argues for the "physically impossible" and, alternatively, the "more than unreasonable" standards of care, whereas Aeromexico asserts that vigilance to see and avoid simply requires a pilot to exercise reasonable care.

### A.

█ The United States initially argues that a pilot is not vigilant if his plane collides with another aircraft unless to see and avoid the aircraft would be physically impossible. The government reasons that such a collision would trigger the presumption of negligence under California law, thereby shifting the burden to the pilot to rebut the presumption. In support of its argument, the government cites *United States v. Miller,* 303 F.2d 703 (9th Cir.1962), *cert. denied,* 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963). In *Miller,* the pilot of a Beechcraft was preparing to land when he collided with a Cessna that was practicing "touch and go" landings. *Id.* at 705. As in this case, at the time of the collision the pilots had clear weather, unlimited visibility, and calm winds, and were proceeding under Visual Flight Rule ("VFR") conditions. *Id.*

One of the issues in *Miller* was whether the Beechcraft pilot, Miller, failed to yield the right-of-way under 14 C.F.R. § 60.14(b) and (d). Specifically, the court grappled with a footnote to § 60.14, which provided: " 'Right-of-way rules do not apply when, for reasons beyond the pilot's control, aircraft

cannot be seen due to restrictions of visibility.…' " *Id.* at 707. The estate of Miller argued that Miller was excused from the right-of-way rules because the district court had found that a " 'reasonable lookout' " might not have seen the Cessna " 'because of his limited visibility and the camouflage effect of the background.' " *Id.* The court rejected this argument and found that the language of the footnote to § 60.14 "appear[s] to contemplate that only *physical impossibility,* due to such factors as weather or terrain, should excuse application of the right-of-way rules." *Id.* (emphasis added).

The government incorrectly attempts to extrapolate this "physical impossibility" standard and apply it to the present case. The *Miller* court clearly indicated that the source of the demanding standard under § 60.14 was the language of the footnote. The parties have not argued that § 60.14 applies in this case, and no similar language appears in the "vigilance to see and avoid" regulation at issue here.

Although the "physical impossibility" standard does not impose strict liability on pilots, it comes close. If we equated "vigilance" with the "physical impossibility" rule, a pilot would be *per se* liable anytime a collision occurred under Visual Flight Rule conditions, regardless of other circumstances. We have rejected in a slightly different context the argument that "the pilot is always negligent when an air crash occurs." *Foss v. United States,* 623 F.2d 104, 106 (9th Cir.1980). In *Foss* a small aircraft collided with a radio tower as it approached the airport. The district court found that the pilot was not contributorily negligent because he was temporarily blinded by the angle of the sun and the haze layer at the time of the crash. At issue on appeal was whether the pilot violated federal regulations providing that "the 'pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of the aircraft' (14 C.F.R. § 91.3) and he must familiarize himself 'with all available information' concerning a flight

---

**3.** The parties to this case do not claim that the common carrier standard of the highest degree of care to passengers, *see* Cal.Civ.Code § 2100 (West 1985), 49 U.S.C.App. § 1421 (1988), ap-

plies because the liability of Aeromexico to those suing on behalf of the passengers is no longer at issue.

(14 C.F.R. § 91.5)." *Id.* at 106. The FAA argued that, despite its own negligence, "the pilot is always in a position of 'final authority' and has the duty to 'familiarize himself with information,' and thus whenever there is a crash he will always have been negligent as a matter of law [under Cal.Evid.Code § 669] because he will have violated these regulations." *Id.* We dismissed the FAA's argument that "concurrent responsibility always results in concurrent liability," *id.,* reasoning that to so hold would "immunize" the FAA from its own negligence, *id.* n. 3.

Although *Foss* may not directly control this case because § 91.67(a) was not at issue there, the principles guiding the court's rejection of a presumed inference of liability from the fact of pilot responsibility applies with equal force to the present case. Moreover, the Fifth Circuit has rejected a similar argument in the context of § 91.67(a). *Transco Leasing Corp. v. United States,* 896 F.2d 1435, 1447 (5th Cir.) ("The duty imposed upon pilots by the regulation is a duty to exercise vigilance so as to see and avoid other aircraft; it is not an absolute duty to see and avoid."), *amended,* 905 F.2d 61 (5th Cir.1990). We therefore draw upon the holding and reasoning of *Foss* and upon the persuasive authority of *Transco Leasing* in rejecting the "physical impossibility" standard.

### B.

Alternatively, the government asserts that the term "vigilance" under § 91.67(a) requires something more than reasonable care, or an elevated degree of reasonableness. It cites a series of cases that place a demanding standard upon pilots under various federal aviation regulations and commonlaw standards.

Most on point is *Rudelson v. United States,* 602 F.2d 1326 (9th Cir.1979), which involved a midair collision between a Piper and a dual-controlled Cessna, piloted by a flight instructor and his student. The court acknowledged that "[t]he Cessna pilots' upward vision may have been partially obstructed by the plane's high wing configuration" and that the student, in particular, "may have found it especially difficult to see the Piper as it approached from the right." *Id.* at 1330. Nevertheless, the court held that "none of these circumstances excused [the student's] duty to see and avoid other aircraft." *Id.* Citing the district court's statement that " '[b]lind spots can be compensated for by head movement and aircraft movement,'" the court upheld the finding that the student pilot was negligent because he violated § 91.67(a). *Id.*

*Mattschei v. United States,* 600 F.2d 205 (9th Cir.1979), is also applicable. In that case, a Cessna and a Cherokee collided in midair under Visual Flight Rule conditions while each pilot communicated with different air traffic controllers on separate radio channels. The district court held that the Cessna pilot was 20% negligent for "his failure to see and avoid other traffic," *id.* at 207, despite the fact that the Cherokee aircraft approached from above and behind the Cessna, *id.* at 208. Because the parties appear not to have appealed the issue of the Cessna pilot's liability, however, *Mattschei,* while persuasive, is not direct circuit court authority on the standard of care question.[4]

---

**4.** Although the United States cites other cases in support of its assertion of an elevated standard of care under § 91.67(a), they are not on point. At issue in the present case is the meaning of "vigilance" to see and avoid other aircraft under § 91.67(a); the other cited cases address different aviation pilot regulations, common law standards, and airplane manufacturer standards, none of which use the term "vigilance." *See Dyer v. United States,* 832 F.2d 1062 (9th Cir. 1987) (addressing liability of helicopter pilot under 14 C.F.R. § 91.89, which requires all helicopters to " 'avoid the flow of fixed-wing aircraft' "); *Hamilton v. United States,* 497 F.2d 370 (9th Cir.1974) (addressing liability of Cessna pilots under 14 C.F.R. § 91.65(a), "which prohibits the operation of 'an aircraft so close to another aircraft as to create a collision hazard' "); *United Air Lines v. Wiener,* 335 F.2d 379 (9th Cir.) (addressing liability of United Air Lines pilot under common carrier standard of care), *cert. dismissed,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); *Elsworth v. Beech Aircraft Corp.,* 37 Cal.3d 540, 691 P.2d 630, 208 Cal.Rptr. 874 (1984) (addressing liability of airplane manufacturer), *cert. denied,* 471 U.S. 1110, 105 S.Ct. 2345, 85 L.Ed.2d 861 (1985); *McGee v. Cessna Aircraft Co.,* 139 Cal.App.3d 179, 188 Cal.Rptr. 542 (Dist. 4 1983) (same); *Mittelman v. Seifert,* 17 Cal.App.3d 51, 94 Cal.Rptr. 654 (Dist. 1 1971) (addressing liability of pilot under willful misconduct standard of care).

*Rudelson* and, to a lesser degree, *Mattschei* illustrate that pilots are held to a high standard of care. The doctrinal question, however, is how best to frame the standard. Do we adopt the government's position and label "vigilance" as an elevated standard of care demanding more than "reasonableness," or do we find that "vigilance" requires the care of a reasonably prudent pilot and that high standards are demanded of such a pilot?

The government complains that the following statement reflects the district court's failure to recognize an elevated standard of care under § 91.67: "The requirement of section 91.67 is one of vigilance to see and avoid those aircraft *the pilot could reasonably be expected to see.* Section 91.67(a) does not require pilots to see all other aircraft." Findings of Fact and Conclusions of Law ("Findings") at 17 (emphasis added). Thus, if we find that "vigilance" denotes an elevated standard of care, we must also find that the district court's articulation of a reasonableness standard was erroneous.

■■■ On the one hand, that federal regulators chose the term "vigilance" instead of "reasonable care" to describe the duties of a pilot suggests they intended that pilots be particularly diligent in searching for other aircraft. On the other hand, the FAA did not use language analogous to the common carrier's standard of the highest degree of care. Because we wish to avoid muddying the waters by introducing some amorphous concept requiring pilots to be "more than reasonable," we decline to interpret "vigilance" as denoting an elevated standard of care.

Instead, we hold that "vigilance" denotes the care that a reasonably prudent pilot would exercise under the circumstances. We find support for this holding in our own decisions, *see Rudelson*, 602 F.2d at 1330 (record supported finding that pilot "breached his duty of reasonable care"), and in the decision of another circuit, *see Transco Leasing*, 896 F.2d at 1447 ("The degree of care required [under § 91.67(a)] is that degree of care that would be exercised by [a] reason-

ably prudent pilot."). Cases such as *Rudelson* and *Mattschei*, then, serve to illustrate the exacting requirements of the reasonably prudent pilot. We emphasize that in the hazardous situation of approaching a busy airport, such a reasonably prudent pilot obviously must be especially careful to see and avoid other aircraft. It is in that sense of "reasonableness" that we construe the regulation's use of the term "vigilance" in this case. Thus although we reject the bright line "physical impossibility" rule used in *Miller*, we adopt that court's articulation of reasonable care as requiring the pilot to search "thoroughly and diligently" for other aircraft. *Miller*, 303 F.2d at 708. Accordingly, the reasonably prudent pilot need not be superhuman in seeing and avoiding other aircraft, but he or she must scan the sky with such frequency and respond with such precision as is possible. We hold that the district court did not err in defining "vigilance" in terms of the reasonably prudent pilot under § 91.67(a) as long as "reasonableness" is construed in accordance with this opinion.

IV. *Whether the Aeromexico Pilots Breached Their Standard of Care.*

■■■ The district court found "that without a warning from the air traffic controller, the crew of [Aeromexico Flight 498] may have failed to see [the Piper] without any negligence on their part." Findings at 7. The United States contends that, regardless of which definition of vigilance is used, the district court could not have found Aeromexico vigilant and thus not negligent. We review whether Aeromexico breached the vigilance standard of care for clear error. *Vollendorff*, 951 F.2d at 217. In other words, we must accept the district court's finding "unless we have a definite and firm conviction that a mistake has been committed." *United States v. Ramos*, 923 F.2d 1346, 1356 (9th Cir.1991).

We agree with the government that the evidence is overwhelming that the Aeromexico pilots would have been negligent not to have seen the Piper at any time before the collision. But there was a great deal of

expert evidence that a reasonably vigilant crew would not have seen the Piper until it was too late to do anything about it.[5] The point at which the unwarned Aeromexico crew, scanning the sky, was more likely than not to have seen the approaching airplane was placed by various experts as just under 12 seconds, 6 seconds, "the last few seconds," and "the last moments prior to collision."[6] There was also testimony placing between 8 and 12.5 seconds the amount of time required to take evasive action.

On the strength of this evidence, the district court found that the Aeromexico crew "was diligent and professional at all *relevant times*." (Emphasis added.) In context, there is little doubt that the "diligence" in question was that of being reasonably vigilant. The government argues that the finding must be clearly erroneous because no evasive action was taken. The expert evidence, however, supports the rest of the same finding of the district court, that "the collision could have occurred even though the Aeromexico pilots were performing diligently and professionally." The government also contends that the Aeromexico pilots must have been negligent because there was no exclamation from the pilots until about the same time that the passengers screamed. We cannot say as a matter of law, however, that the absence of comment is inconsistent with the Aeromexico crew's having seen the Piper "in the last moments prior to collision"—the point at which one expert stated

that a scanning crew would be more likely than not to see the approaching aircraft.

It is true, as the government states, that there is other evidence suggesting that the Aeromexico crew, if reasonably vigilant, should have seen the Piper in time to avoid the collision. The district court was not required to accept that evidence, however, and we cannot say that its finding that the crew was diligent and professional at all relevant times was clearly erroneous in light of all of the evidence.

## V. *Causation.*

It follows from our discussion of the negligence issue that the district court also did not clearly err when it found, in the section of its findings entitled *"Causes of Accident,"* that "[t]here is no evidence that Aeromexico was in any way negligent, or committed any act or omission, which contributed to this accident."

**AFFIRMED.**

**5.** John Andrews, on behalf of Aeromexico, testified that the probability of the Aeromexico pilots seeing the Piper 60 seconds before impact was well below 3%; that the probability of acquisition 25 seconds before impact was approximately 15%; and that the probability of acquisition 12 seconds before impact was approximately 46%. He concluded that "the crew of the DC–9 was unlikely to acquire the Piper until the last few seconds before collision...." James Harris, also on behalf of Aeromexico, testified that the probability of acquisition at 16 seconds before impact was 6–7%; at 10 seconds before impact was 23%; at 8 seconds before impact was 36%; and at 6 seconds before impact was 50%. David Bean, on behalf of the Steering Committee, testified that it was impossible for the Aeromexico pilots to have seen the Piper more than 17 sec-

onds before impact. He stated that it was possible that the Aeromexico pilots "wouldn't see [the Piper] until perhaps the last moments prior to collision...." He also testified that "good crews have one person looking out all the time." Finally, Dr. Arthur Ginsburg, on behalf of the United States, testified that the Aeromexico pilots' probability of acquisition 14.6 seconds before impact was 75%.

**6.** The government's witness testified to earlier likelihood of recognition—a 75% probability of seeing the approaching aircraft 14.6 seconds before impact. The district court was not obligated to accept this testimony in place of that of the other experts, however.